## COMMONWEALTH *vs.* JOSEPH MULVEY.

No. 01-P-742.

Worcester. November 6, 2002. - March 14, 2003.

Present: BROWN, BERRY, & COHEN, JJ.

*Idle and Disorderly Person. Statute,* Construction. *Words,* "Public."

At the trial of a criminal complaint charging disorderly conduct in violation of G. L. c. 272, § 53, there was insufficient evidence to prove the public element of the offense, and the judge therefore erred in denying the defendant's motion for a required finding of not guilty, where the defendant's conduct took place on purely private property, and the Commonwealth failed to establish that the disturbance had or was likely to have had an impact upon persons in an area accessible to the public. [582-585]

COMPLAINT received and sworn to in the Dudley Division of the District Court Department on April 18, 2000.

The case was tried before *Thomas F. Sullivan, Jr.,* J.

*Joseph Mulvey,* pro se.

*Anne S. Kennedy,* Assistant District Attorney, for the Commonwealth.

COHEN, J. When three members of the Oxford police force presented themselves at the driveway of the defendant's mother's house to serve him with an out-of-State restraining order, the defendant became distraught. By the end of the encounter, the defendant was under arrest for assault and battery on a police officer and disorderly conduct. After a District Court trial, at which the defendant represented himself, a jury acquitted the defendant of assault and battery, but found him guilty of disorderly conduct. He appeals, claiming that his motion for a required finding of not guilty should have been allowed because the Commonwealth failed to introduce sufficient evidence to prove the public element of the disorderly conduct offense. We agree and reverse the judgment of conviction.

1. *The evidence.* Taking the evidence in the light most favorable to the prosecution, see *Commonwealth* v. *Latimore,* 378 Mass. 671, 677 (1979), the Commonwealth established the following facts. On April 17, 2000, Officer Kevin Kennedy of the Oxford police department received a New Hampshire restraining order that had been taken out against the defendant. At about 2:00 P.M., Officer Kennedy and another officer, Michael Hassett, drove to the defendant's mother's house and waited by the side of the road for the defendant to appear.[1] When the officers spotted the defendant, they contacted their shift supervisor, Sergeant Michael Boss, who joined them approximately ten minutes later.

The defendant's mother's property was set back off the road and was surrounded by a variety of different types of fencing. There was a seventy-five to 100 foot long driveway between the road and the house. Entry to the driveway was through a large gate, composed of eight foot high chain link fencing. Green slats had been threaded through the chain link, making it difficult to see through.[2]

Before Sergeant Boss arrived, Officers Kennedy and Hassett waited "right outside the gate." The only testimony relating to the public or private character of this location was Officer Kennedy's testimony that he was not sure if the gate to the fence was "right on" the public way.

From their vantage point at the gate, the two officers watched the defendant walk back and forth and heard him shouting that they should leave his property; however, because of the green slats in the fencing, it was hard for them to see the defendant at all times. Officer Kennedy estimated that, on average, the defendant was approximately thirty feet away, and was never

---

[1] At trial, the defendant claimed that the restraining order was invalid and that eventually it was withdrawn. For present purposes, however, the fate of the order is irrelevant. We assume that the officers were attempting to serve the defendant with a valid order, or one that was proper on its face, and that they could enter private property to do so. See Nolan & Sartorio, Tort Law § 176, at 297-298 (2d ed. 1989); Restatement (Second) of Torts §§ 208, 209 (1965). We need not consider whether in-hand delivery to the defendant was, as the officers appear to have believed, the only proper means of serving a New Hampshire restraining order.

[2] It is not clear from the record whether the entire fence had been fitted this way or just the gate area.

closer than twenty feet from where the officers stood. Officer Kennedy noticed that the defendant was "animated," "upset," and "red in the face."

When Sergeant Boss arrived, he, too, observed the defendant yelling and pacing. He attempted to persuade the defendant to come out; but when these efforts were unavailing, Sergeant Boss proceeded up the driveway by going through a gap in the gate that was wide enough to admit a person, but not a car. He tried to hand the defendant the restraining order, but the defendant refused to take it.[3] The defendant then put his hands behind his back and shouted that the sergeant should get off the property. Finally, with his hands behind his back, the defendant walked quickly towards Sergeant Boss and bumped into him.[4] Thinking that the defendant might hit him, Sergeant Boss grabbed one of the defendant's arms. At that point, the other two officers came up the driveway, restrained the defendant, and placed him under arrest.

According to Sergeant Boss, when the defendant made contact with him, they were fifty feet from the house — halfway up the driveway. Sergeant Boss opined that the arrest was effectuated in the left-hand corner of the property, about fifteen feet from the rear door of the house. Officer Kennedy placed the arrest somewhat closer to the road, at about thirty feet from the gate. The only person present during any part of the incident, other than the defendant and the officers, was the defendant's mother, who stood off to the side (on her own property) as the defendant was arrested.

---

[3] At this point, it might have been the better part of valor for Sergeant Boss simply to announce the nature of the order and leave it in the vicinity of the defendant. Effectuating in-hand service upon a recalcitrant individual does not require more. Although Massachusetts cases do not appear to have addressed the problem, it has been widely held elsewhere that an individual cannot avoid in-hand service by refusing physically to take the tendered papers. See generally 62B Am. Jur. 2d Process § 204 (1990); 72 C.J.S. Process § 43 (1987 & Supp. 2002).

[4] The defendant's version of events, established through his testimony and that of his mother, was that because his family had a poor relationship with the local police, he deliberately put his hands behind his back to avoid a confrontation; he continually backed up as Sergeant Boss approached him; and it was Sergeant Boss who made contact with him when Boss tripped and stumbled.

2. *Discussion.* The statute authorizing prosecutions for disorderly conduct, G. L. c. 272, § 53,[5] has been saved from constitutional infirmity by incorporating the definition of "disorderly" contained in § 250.2(1)(a) and (c) of the Model Penal Code (1980). See *Commonwealth* v. *Chou,* 433 Mass. 229, 231-232 (2001) (summarizing history of § 53 and its construction). See also *Alegata* v. *Commonwealth,* 353 Mass. 287, 303-304 (1967); *Commonwealth* v. *A Juvenile,* 368 Mass. 580, 595-597 (1975). "The resulting definition of 'disorderly' . . . includes only those individuals who, 'with purpose to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof . . . : (a) engage[] in fighting or threatening, or in violent or tumultuous behavior; or . . . (c) create[] a hazardous or physically offensive condition by any act which serves no legitimate purpose of the actor.' " *Commonwealth* v. *Chou, supra* at 232 (citations omitted).[6] "Public" is defined as "affecting or likely to affect persons in a place to which the public or a substantial group has access." *Commonwealth* v. *A Juvenile, supra* at 586 (citing Model Penal Code definition quoted in *Alegata* v. *Commonwealth, supra* at 304).[7]

The public element of the offense is readily met in cases where the proscribed conduct takes place on public streets, see

---

[5]The statute reads: "Common night walkers, common street walkers, both male and female, common railers and brawlers, persons who with offensive and disorderly acts or language accost or annoy persons of the opposite sex, lewd, wanton and lascivious persons in speech or behavior, idle and disorderly persons, disturbers of the peace, keepers of noisy and disorderly houses, and persons guilty of indecent exposure may be punished by imprisonment in a jail or house of correction for not more than six months, or by a fine of not more than two hundred dollars, or by both such fine and imprisonment." G. L. c. 272, § 53.

[6]The application of Model Penal Code § 250.2(1)(c) is restricted to cases not involving protest or other expressive activities. See *Commonwealth* v. *Feigenbaum,* 404 Mass. 471, 475 (1989); *Commonwealth* v. *Sholley,* 432 Mass. 721, 728 (2000), cert. denied, 532 U.S. 980 (2001).

[7]The public element also has been engrafted onto the "lewd, wanton and lascivious" offense of § 53. See *Commonwealth* v. *Templeman,* 376 Mass. 533, 537 (1978). In that setting, the requirement that the conduct have a public element has been rigidly applied. See, e.g, *Commonwealth* v. *Sefranka,* 382 Mass. 108, 117-118 (1980); *Commonwealth* v. *Roy,* 420 Mass. 1, 3 (1995). On the other hand, the "accosting and annoying" offense of § 53 has been held to extend to conduct or language that has only a personal and private impact. *Commonwealth* v. *Chou, supra* at 233.

*Commonwealth* v. *Mulero,* 38 Mass. App. Ct. 963, 963-964 (1995); or by the side of a highway, see *Commonwealth* v. *Bosk,* 29 Mass. App. Ct. 904, 906-907 (1990). It also may be satisfied where the disturbance takes place in a more secluded environment, but only if members of the public are likely to be affected. See *Commonwealth* v. *Collins,* 36 Mass. App. Ct. 25, 33 (1994) (disruption occurred in area of police station that was public place); *Commonwealth* v. *LePore,* 40 Mass. App. Ct. 543, 549 (1996) (voyeur's conduct, even though unseen by victim, occurred in public alley). Compare *Commonwealth* v. *Blavackas,* 11 Mass. App. Ct. 746, 747-750 (1981) (defendant's sexual solicitation and conduct should not have been prosecuted as disorderly conduct; regardless, public element was not met where acts took place in car parked fifty feet from street, up driveway and on lawn area of house).

Whether the disturbance itself occurs on publicly owned property is not dispositive. The public element may be satisfied where the actor's conduct takes place on private property that is frequented by the public, such as stores, apartment houses, or theaters. See Model Penal Code § 250.2 comment 2, at 329. See also *Commonwealth* v. *Carson,* 10 Mass. App. Ct. 920, 921-922 (1980) (tumultuous conduct in dormitory and abutting plaza). It also is possible that behavior occurring on purely private property may be shown to affect or be likely to affect persons in an adjacent or nearby "place to which the public or a substantial group has access," Model Penal Code § 250.2, such that a disorderly conduct charge would be appropriate. Still, "[n]othing less than conscious disregard of a substantial and unjustifiable risk of public nuisance will suffice for liability." Model Penal Code § 250.2 comment 2, at 328-329.

Here, the defendant's conduct took place on purely private property. Thus, in order to satisfy the public element of the crime, the Commonwealth was required to establish that the disturbance nevertheless had or was likely to have had an impact upon persons in an area accessible to the public. This it did not do. As it stood at the end of the Commonwealth's case,[8] the actions that precipitated the defendant's arrest took place thirty to

---

[8]During the defendant's case, the defendant's mother testified that the road on which her property fronted was a secluded, country road; that her place

fifty feet up the driveway, shielded from off-premises view by the partially opaque fence. There was no evidence that a crowd, inquisitive neighbors, or passersby actually saw or heard the disturbance. Nor was there any evidence to establish that people could have seen or heard the defendant from any place of public access, such as a nearby sidewalk, publicly used path or road, shopping area or other neighborhood facility.

We disagree with the Commonwealth that the public element was established by the fact that Officers Kennedy and Hassett observed the disruption. The officers' presence, alone, did not suffice to prove the public element, regardless of any concern they may have felt as they witnessed the defendant's confrontation with Sergeant Boss. As recognized in the commentaries to the Model Penal Code, behavior that has an impact only upon members of the police force is significantly different from that affecting other citizens in at least two respects: it is an unfortunate but inherent part of a police officer's job to be in the presence of distraught individuals; and, to the extent that the theory behind criminalizing disorderly conduct rests on the tendency of the actor's conduct to provoke violence in others, "one must suppose that [police officers], employed and trained to maintain order, would be least likely to be provoked to disorderly responses." Model Penal Code § 250.2 comment 7, at 350. Accordingly, police presence in and of itself does not turn an otherwise purely private outburst into disorderly conduct.[9]

To use the officers' presence as evidence of the encounter's potential public impact, the Commonwealth would have had to prove that the spot from which they peered through the gate was a place to which the public had access. This it failed to do. But even if the officers' vantage point had been shown to be in an area accessible to or frequented by the public, we question

---

was isolated; and that no matter how she might scream, no one would hear her. She also testified, however, that youngsters from town would come around to harass them, and that before the fencing was put up a gang of "punks" would come by "night after night."

[9]*Commonwealth* v. *Collins*, 36 Mass. App. Ct. at 33, does not hold otherwise. Although that case upheld a conviction for disorderly conduct in a police station, the result turned on the fact that the tumult occurred in a corridor leading up to the booking desk and that this area was a "public place."

whether there was a significant likelihood of public impact, given the physical barrier of the slatted gate and the defendant's distance from it some thirty to fifty feet away. In sum, on the facts presented, the defendant's conduct could not be found to have created the substantial and unjustifiable risk of public nuisance that is the sine qua non of the offense.

3. *Disposition.* As the defendant was entitled to an acquittal under his motion for a required finding of not guilty, the judgment of conviction is reversed, the verdict is set aside, and judgment is to be entered for the defendant.

*So ordered.*